Filed 3/13/25  Wilson v. County of Humboldt CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOHN P. WILSON et al.,<br><br>　　Plaintiffs and Appellants,<br><br>v.<br><br>COUNTY OF HUMBOLDT, et al.,<br><br>　　Defendants and Respondents,<br><br><br>JOEL GECK-MOELLER,<br><br>　　Real Party in Interest. | A170333<br><br>(Humboldt County<br>Super. Ct. No. CV2300981) |

Petitioners John P. Wilson and Cyndy Day-Wilson filed this ordinary mandamus proceeding (Code Civ. Proc., § 1085) to compel respondents County of Humboldt and Mario Kalson, the County's Director of Environmental Health, to require their neighbor, real party in interest Joel Geck-Moeller, to destroy a well on his property.  The trial court denied the writ petition, ruling the County has no ministerial duty to force Geck-Moeller to destroy his well.

On appeal, the Wilsons continue to maintain respondents have a ministerial duty to require Geck-Moeller to destroy his well, advancing a two-part argument.  They first assert the well is "permanently inactive" for

1

purposes of Health and Safety Code section 115700,[1] despite the fact the well is now permitted and is being maintained consistent with statutory standards.  They secondly assert respondents have a mandatory ministerial duty under section 115700, California Department of Water Resources (DWR) Well Water Standards Bulletins, and Humboldt County's Well Ordinance, to order the destruction of any "permanently inactive" well.  They additionally maintain the trial court erred in signing a proposed judgment submitted by Geck-Moeller and by denying attorney fees.  We affirm.

## BACKGROUND

### *Regulatory Framework*

The pertinent regulatory framework consists of section 115700, DWR Water Well Standards Bulletins, and Humboldt County Ordinance No. 1885 (codified in the Humboldt County Code as § 631-1 et seq.) (hereinafter the "county well ordinance").

#### *Section 115700*

Section 115700 appears in division 104 of the Health and Safety Code, part 9.5, titled "Abandoned Excavations."  The statute states in pertinent part:

> "(b) Every person owning land in fee simple or in possession thereof under lease or contract of sale who knowingly permits the existence on the premises of any permanently inactive well . . . that constitutes a known or probable preferential pathway for the movement of pollutants, contaminants, or poor quality water, from above ground to below ground, or vertical movement of pollutants, contaminants, or poor quality water below ground, and that movement poses a threat to the quality of the waters of the state, shall be guilty of a misdemeanor.
>
> "(c) For purposes of this section, 'well' includes any of the following: [¶] . . . [¶]

---

[1]  All further statutory references are to the Health and Safety Code unless otherwise indicated.

2

"(3) A 'water well' as defined by Section 13710 of the Water Code.[2]

"(d) A 'permanently inactive well' is a well that has not been used for a period of one year, unless the person owning land in fee simple or in possession thereof under lease or contract of sale demonstrates an intent for future use for water supply, groundwater recharge, drainage, or groundwater level control, heating or cooling, cathodic protection, groundwater monitoring, or related uses. A well owner shall provide evidence to the local health officer of an intent for future use of an inactive well by maintaining the well in a way that the following requirements are met:

"(1) The well shall not allow impairment of the quality of water within the well and groundwater encountered by the well.

"(2) The top of the well or well casing shall be provided with a cover, that is secured by a lock or by other means to prevent its removal without the use of equipment or tools, to prevent unauthorized access, to prevent a safety hazard to humans and animals, and to prevent illegal disposal of wastes in the well. The cover shall be watertight where the top of the well casing or other surface openings to the well are below ground level, as in a vault or below known levels of flooding. The cover shall be watertight if the well is inactive for more than five consecutive years. A pump motor, angle drive, or other surface feature of a well, when in compliance with the above provisions, shall suffice as a cover.

---

[2] Water Code section 13710 is set forth in the definitional provisions of chapter 10 of division 7 of the Water Code pertaining to water quality. The Legislature findings underlying the enactment of division 7 state in pertinent part: "[T]he greater portion of the water used in this state is obtained from underground sources and . . . those waters are subject to impairment in quality and purity, causing detriment to the health, safety and welfare of the people of the state. The Legislature therefore declares that the people of the state have a primary interest in the location, construction, maintenance, abandonment, and destruction of water wells, cathodic protection wells, groundwater monitoring wells, and geothermal heat exchange wells, which activities directly affect the quality and purity of underground waters."

"(3) The well shall be marked so as to be easily visible and located, and labeled so as to be easily identified as a well.

"(4) The area surrounding the well shall be kept clear of brush, debris, and waste materials.

"(e) At a minimum, permanently inactive wells shall be destroyed in accordance with standards developed by the Department of Water Resources pursuant to Section 13800 of the Water Code and adopted by the State Water Resources Control Board or local agencies in accordance with Section 13801 of the Water Code.  Minimum standards recommended by the department and adopted by the state board or local agencies for the abandonment or destruction of groundwater monitoring wells or class 1 hazardous injection wells shall not be construed to limit, abridge, or supersede the powers or duties of the department, in accordance with Section 13801 of the Water Code.

"(f) Nothing in this section is a limitation on the power of a city, county, or city and county to adopt and enforce additional penal provisions regarding the types of wells and other excavations described in subdivisions (a) and (b)."  (§ 115700, subds. (b), (c)(3), (d)(1)–(4), (e), (f).)

### *DWR Well Standards*

DWR "has responsibility for developing standards for wells for the protection of water quality under California Water Code section 231."  (Dept. of Water Resources, The Resources Agency, Water Well Standards: State of California, Bulletin 74-90 (June 1991) p. 3 (hereafter Bulletin 74-90).)  DWR first published a comprehensive set of well standards in December 1981 in what is generally referred to as Bulletin 74-81.  (*Id.,* at foreward & p. 4; see Dept. of Water Resources, The Resources Agency, Water Well Standards: State of California, Bulletin 74-81 (Dec. 1981) (hereafter Bulletin 74-81).)  It has since published two revisions which operate in conjunction with Bulletin 74-81.  (Bulletin 74-90, pp. 4–5.)  The most recent is generally referred to as Bulletin 74-90.  (See *id.,* pp. 3–5.)

4

The bulletins collectively set forth lengthy and detailed technical standards for the "construction, alteration, maintenance, and destruction of water wells, monitoring wells, and cathodic protection wells in California." (Bulletin 74-90, foreward.) The overarching purpose of these standards is to protect groundwater quality. "Improperly constructed, altered, maintained, or destroyed wells are a potential pathway for introducing poor quality water, pollutants, and contaminants to good-quality ground water. The potential for ground water quality degradation increases as the number of wells and borings in an area increases." (*Id.,* p. 3.) "Permanently inactive or 'abandoned' wells that have not been properly destroyed pose a serious threat to water quality. They are frequently forgotten and become dilapidated with time, and thus can become conduits for ground water quality degradation. In addition, humans and animals can fall into wells left open at the surface." (*Ibid.*)

Part III of Bulletin 74-81 sets forth the standards pertaining to the "Destruction of Wells," supplemented by Part III of Bulletin 74-90. (Bulletin 74-81, Bulletin 74-90, p. 28.) Section 20 of Part III, titled "Purpose of Destruction," states in pertinent part: "A well that is no longer useful . . . must be destroyed in order to: [¶] 1 Assure that the ground water supply is protected and preserved for further use. [¶] 2 Eliminate the potential physical hazard." (Bulletin 74-81.)

Section 21 of Part III, titled "Definition of 'Abandoned' Well," states in pertinent part: " 'A well is considered "abandoned" or permanently inactive if it has not been used for one year, unless the owner demonstrates intention to use the well again. In accordance with Section 24400 [now § 115700] of the California Health and Safety Code, the well owner shall properly maintain an inactive well as evidence of intention for future use in such a way that the

5

following requirements are met: [¶] '(1) The well shall not allow impairment of the quality of water within the well and ground water encountered by the well. [¶] (2) The top of the well or well casing shall be provided with a cover, that is secured by a lock or by other means to prevent its removal without the use of equipment or tools, to prevent unauthorized access, to prevent a safety hazard to humans and animals, and to prevent illegal disposal of waste in the well. . . . [¶] (3) The well shall be marked so as to be easily visible and located, and labeled so as to be easily identified as a well. [¶] (4) The area surrounding the well shall be kept clear of brush, debris, and waste materials.' " (Bulletin 74-90, p. 28.[3])

Section 22 of Part III, titled "General Requirement," states in pertinent part: "All 'abandoned' wells . . . shall be destroyed. The objective of destruction is to restore as nearly as possible those subsurface conditions which existed before the well was constructed taking into account also changes, if any, which have occurred since the time of construction. . . . [¶] Destruction of a well shall consist of the complete filling of the well in accordance with the procedures described in Section 23 (following)." (Bulletin 74-81.)

Section 23 and following sections set forth detailed technical requirements and specifications for proper destruction. (Bulletin 74-81.)

---

[3] The prior definition of "Abandoned Well" set forth in section 22 of Bulletin 74-81 was similar. (Bulletin 74-81.) The term was further defined in Appendix A of Bulletin 74-81 as "[a] well whose use has been permanently discontinued or which is in such a state of disrepair that no water can be produced. Because abandonment is a state that also involves intent on the part of the well owner, a definition that prescribes a set of conditions and a time limit for use in applying standards appears in Section 21 of Chapter II, 'Standards,' of this report." (*Id.,* appendix A.) The term "[i]nactive well" was also defined in Appendix A as "[a] well not routinely operated but capable of being made an operating well with a minimum of effort." (*Ibid.*)

6

Section 3, titled "Exemption Due to Unusual Conditions," of Chapter II of Bulletin 74-81, titled "Standards," provides for exemptions to the standards in appropriate circumstances and states: "If the enforcing agency finds that compliance with any of the requirements prescribed herein is impractical for a particular location because of unusual conditions or if compliance would result in construction of an unsatisfactory well, the enforcing agency may waive compliance and prescribe alternative requirements which are 'equal to' these standards in terms of protection obtained."[4] (Bulletin 74-81.)

With the enactment of Water Code section 13801, the State Water Resources Control Board was tasked with adopting by 1989 a "model well ordinance implementing DWR standards."[5] (Bulletin 74-90, p. 3.) Local

---

[4] The Standards set forth in Part II of Bulletin 74-81, including section 3, are expressly incorporated by reference in "Standards [¶] Part I. General" (some capitalization omitted) of Bulletin 74-90. (Bulletin 74-90, p. 11.)

[5] Water Code section 13801 provides in pertinent part:

"(c) Notwithstanding any other law, each county, city, or water agency, where appropriate, shall, not later than January 15, 1990, adopt a water well, cathodic protection well, and monitoring well drilling and abandonment ordinance that meets or exceeds the standards contained in Bulletin 74-81. Where a water agency that has permit authority over well drilling within the agency adopts a water well, cathodic protection well, and monitoring well drilling and abandonment ordinance that meets or exceeds the standards contained in Bulletin 74-81, a county or city shall not be required to adopt an ordinance for the same area.

"(d) If a county, city, or water agency, where appropriate, fails to adopt an ordinance establishing water well, cathodic protection well, and monitoring well drilling and abandonment standards, the model ordinance adopted by the state board pursuant to subdivision (b) shall take effect on February 15, 1990, and shall be enforced by the county or

7

entities were required by 1990 to either adopt a local well ordinance "that meets or exceeds DWR well standards" or, if an entity chose not to do so, to enforce the model well ordinance. (*Ibid.*)

### County Well Ordinance

In accordance with Water Code section 13801, the County, through Ordinance No. 1885, enacted its own well ordinance, codified in the Humboldt County Code at sections 631-1 et seq.[6]

"Except as otherwise required by the context," the well ordinance expressly incorporates the terms and definitions used in the DWR Well Standards Bulletins. (Humboldt County Code, § 631-2, subd. (a).) The ordinance requires that a permit be obtained from the County Department of Health and Human Services Public Health Branch (which the parties refer to as "DEH," as shall we) to "dig, bore, drill, deepen, modify, repair, or destroy a water well," and sets forth the requirements for a permit. (*Id.,* §§ 631-3, 631-4.)

DEH "may condition the permit in any manner necessary to carry out the purposes of the division." (Humboldt County Code, § 631-6, subd. (a).) On receipt of an application for a permit, DEH "may make an inspection of the drilling site" to determine whether "there are any site conditions" that warrant relocating the drilling site or imposing additional conditions "to remediate any previously unknown ground water quality protection problems." (*Id.,* § 631-13, subd. (a)(1), (2).) DEH can waive inspections

city and have the same force and effect as if adopted as a county or city ordinance." (Wat. Code, § 13801, subds. (c) & (d).)

[6] We take judicial notice of the complete well ordinance on our own motion. (Evid. Code, §§ 452, subd. (b), 459.)

"when the drilling site is well known" to it and "no significant threats to ground water quality exist in the area." (*Id.*, subd. (d)(3).)

The work authorized by a permit is to "be completed within the time and before the date set out in the permit." (Humboldt County Code, § 631-8.) "If there have been exceptional circumstances," DEH may grant extensions. (*Ibid.*)

Except as specified, the well ordinance incorporates "the standards for the construction, repair, reconstruction, or destruction of wells . . . set forth in" the DWR Well Standards Bulletins. (Humboldt County Code, § 631-10.) As pertinent here, the ordinance states, "All persons owning an abandoned w[e]ll as defined in" the DWR Well Standards Bulletins "shall destroy it before December 31, 1991, except those excluded by California Health and Safety Code [section] 24440." (*Id.,* § 631-17.)

DEH may "grant a variance from any provision of the standards" and "prescribe alternative requirements in their place" if there is "a special circumstance where practical difficulties or unnecessary hardship would result from the strict interpretation and enforcement of any standard" and the "granting of such a variance is consistent with the purpose of the division." (Humboldt County Code, § 631-11, subds. (a), (b).)

The well ordinance provides for criminal and civil enforcement. (Humboldt County Code, § 631-18.) A violation of the ordinance is a misdemeanor. (*Id.,* subd. (a).) With respect to civil enforcement, the ordinance specifies that DEH is the " '[e]nforcement agency' " and it "may record a notice of violation." (*Id.,* §§ 631-2, subd. (c), 631-18., subd. (b)(1).) The owner of the property may "submit evidence" to DEH "indicating that there is no violation." (*Id.,* § 631-18., subd. (b)(1).) If DEH remains of the view there is a violation, the owner may appeal to the County Board of

9

Supervisors.  (*Ibid.*)  In an appeal, the owner may submit evidence to the Board, and the Board must thereafter make a decision to either affirm, reverse, or modify the notice of violation, and issue an appropriate order. (*Id.*, subd. (b)(2)(A)–(C).)  A person violating the ordinance may also be subject to a nuisance action, and DEH may bring an abatement action.  (*Id.*, subds. (c) & (d).)

DEH must annually report to the California Regional Water Quality Control Board the number of wells constructed or destroyed, descriptions of all well destructions done through "nuisance abatement powers," a description of variances, and a description of inspection waivers.  (Humboldt County Code, § 631-19, subds. (a)–(d).)

With this overview of the regulatory environment, we turn to the factual background of this case.

### *Factual Background*

The well at issue is located on property that has been largely undeveloped and vacant for decades.

In 1981, the then-owners applied to the Humboldt County Planning and Building Department for a conditional use permit to construct greenhouses on the property.  The matter was referred to DEH.  DEH staff conducted a site inspection and observed a well which was unpermitted (we shall refer to this well as "the well" or the "1981 well").  On parcel file notes, staff noted there were two, 8-inch casings in the well.  DEH notified the then-owners a permit was required for all new well construction and they were required to apply for a permit.  The then-owners submitted an application. Ultimately, the development never proceeded, there was no final inspection of the well, and the applied-for well construction permit remained unissued.

10

More than 30 years later, in February 2017, DEH received a complaint of an illegal well and open borehole on the property (which we shall refer to as the "2017 well"), described as being approximately forty feet deep and four feet in diameter. DEH inspected the property but was unable to locate the reported well and borehole. It contacted the owner for further information. In March 2018, DEH returned to the property, located the open borehole, and determined it was a potential hazard. In May, the owner applied for one well construction permit and one well destruction permit. DEH advised that both lacked the required signature of a licensed well driller and were therefore incomplete. In February 2021, DEH issued a first notice of violation for the 2017 well, followed by a second notice the following month. In April, DEH approved the application for a well destruction permit and the 2017 well was destroyed while DEH staff were onsite.

The property was subsequently listed for sale, and in 2021 Geck-Moeller began the purchasing process.

In December 2021, DEH was contacted by well drillers regarding the wells on the property. The drillers subsequently submitted documentation pertaining to the 1981 well. At the beginning of January 2022, DEH completed final inspection of the well pursuant to the still-pending 1981 construction permit application and signed off on the permit.

Also in December, the Wilsons became aware of the 1981 well, and in early January 2022, they submitted a complaint to DEH of a possible code violation. The complaint alleged the owner was attempting to sell the property without having closed the well, which assertedly had been abandoned for 40 years, and was performing work on the well without a permit.

DEH investigated the complaint and determined the well in question was the 1981 well for which a permit had been issued. It further concluded the work on the well described in the complaint was maintenance activity which did not violate the DWR Well Standards or the county's well ordinance.

In March 2022, Geck-Moeller completed his purchase of the property and thereafter applied for a coastal development permit from the Planning and Building Department to build a 1,560 square foot single-family residence and detached two-car garage, utilizing an existing septic system and the now permitted and properly maintained 1981 well. The Planning and Building Department sent DEH a referral for the proposed development.

The Wilsons continued to oppose Geck-Moeller's residential use of the property, and in April 2022, submitted a formal complaint on behalf of themselves and nearby landowners to the Planning and Building Department, complaining about, among other things, unpermitted vegetation removal and use of the well.

In mid-June, DEH responded to the referral from the Planning and Building Department, recommending conditional approval of the residential development, subject to several conditions, including dry weather production testing of the well.

In August, the water production testing required by DEH was conducted. Geck-Moeller later requested and received a variance of the production standards, and DEH approved the testing, noting the County Code required further water quality sampling and potability analysis. These analyses were also done, and the well satisfied water quality requirements.

In November, DEH received a further "objection" to Geck-Moeller's proposed residential development. The asserted deficiencies included use of an "abandoned" well.

12

The same month, DEH inspected the " 'inactive' " 1981 well and determined it had come into compliance with section 115700, given that Geck-Moeller indicated his intent to utilize the well for future use and the well had been equipped with a tight-fitting and locked cap, marked with a red bucket to be easily identifiable, and kept clear of brush and debris.

Six months later, in May 2023, DEH notified the Planning and Building Department that, based on the water production and water quality test results, it recommended approval of Geck-Moeller's development application.

In June, the planning commission scheduled a hearing on Geck-Moeller's coastal development permit for early July.

Five days after the commission issued its notice setting the hearing, the Wilson's filed this writ proceeding. Three days before the scheduled July hearing, the trial court issued a stay of further proceedings on Geck-Moeller's application for a coastal development permit.

In October, the trial court issued a tentative decision in the instant writ proceeding, ruling respondents had no ministerial duty to require Geck-Moeller to destroy the 1981 well and denying the Wilsons' request for attorney fees. In January 2024, the court entered judgment, adopting its tentative decision.

## DISCUSSION

### *Writ Petition Standards*

"A traditional writ of mandate will issue to 'compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station' (Code Civ. Proc., § 1085), 'where there is not a plain, speedy, and adequate remedy, in the ordinary course of law' (*id.*, § 1086)." (*CV Amalgamated LLC v. City of Chula Vista* (2022) 82 Cal.App.5th 265, 278 (*CV*

*Amalgamated*).) "A court may issue a writ of mandate to compel a public agency or officer to perform a mandatory duty." (*Ellena v. Department of Ins.* (2014) 230 Cal.App.4th 198, 205 (*Ellena*).) "This type of writ petition 'seeks to enforce a mandatory and ministerial duty to act on the part of an administrative agency or its officers.' " (*The H.N. & Frances C. Berger Foundation v. Perez* (2013) 218 Cal.App.4th 37, 46.)

"' "A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists." ' [Citation.] 'A public entity has a ministerial duty to comply with its own rules and regulations where they are valid and unambiguous.' " (*CV Amalgamated*, *supra*, 82 Cal.App.5th at p. 279.)

A writ " 'will not issue if the duty is . . . mixed with discretionary power.' " (*Coast Community College Dist. v. Commission on State Mandates* (2022) 13 Cal.5th 800, 815.) "Even if ' " 'mandatory language appears in [a] statute creating a duty, the duty is discretionary if the [public entity] must exercise significant discretion to perform the duty.' " ' " (*Childhelp, Inc. v. City of Los Angeles* (2023) 91 Cal.App.5th 224, 239 (*Childhelp*).) "' "Discretion . . . is the power conferred on public functionaries to act officially according to the dictates of their own judgment." ' " (*Monterey Coastkeeper v. California Water Quality Control Bd., ETC.* (2022) 76 Cal.App.5th 1, 19.)

" 'When reviewing a trial court's judgment on a petition for ordinary mandate, we apply the substantial evidence test to the trial court's findings of fact and exercise our independent judgment on legal issues, such as the interpretation of statutory . . . requirements.' " (*Cape Concord Homeowners*

14

*Assn. v. City of Escondido* (2017) 7 Cal.App.5th 180, 189.) "Whether a statute or ordinance . . . imposes 'a ministerial duty, for which mandamus will lie, or a mere obligation to perform a discretionary function is a question of statutory interpretation.' [Citations.] In the context of a request for 'mandamus relief, where statutory interpretation is required, the question of whether an agency has an enforceable ministerial duty under a local ordinance is treated as an issue of law, subject to de novo review.' " (*Childhelp*, *supra*, 91 Cal.App.5th at p. 239.)

### *Respondents Do Not Have a Ministerial Duty to Require Destruction of the Well*

The Wilsons ground their claim that respondents have a ministerial duty to order Geck-Moeller to destroy his well on the assertion the well is " 'permanently inactive' " as defined in section 115700. Respondents, in turn, maintain DEH properly determined the well is "inactive" (but not "permanently inactive") and is being maintained in accordance with statutory standards.

"It is well settled that when interpreting a statute we 'determine and give effect to the intent of the enacting legislative body.' (*People v. Braxton* (2004) 34 Cal.4th 798, 810. . . .) To do this, ' "[w]e first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." [Citation.] If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls.' (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818. . . .) '[T]he various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.'

15

(*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 505. . . .)" (*Ellena, supra,* 230 Cal.App.4th at pp. 208–209.) "If the statute is susceptible to more than one interpretation, we 'may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.]' (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003. . . .)" (*Ellena,* at p. 209.)

As we have recited, section 115700 speaks in terms of "inactive" and "permanently inactive" wells and provides that any landowner or possessor under a lease or purchase agreement "who knowingly permits the existence . . . of any permanently inactive well" on their property that "constitutes a known or probable preferential pathway for the movement of pollutants, contaminants, or poor water quality, from above ground to below ground, or vertical movement of pollutants, contaminants, or poor quality water below ground, and that movement poses a threat to the quality of the waters of the state, shall be guilty of a misdemeanor." (§ 115700, subd. (b).) It further provides, "At a minimum, permanently inactive wells shall be destroyed in accordance with standards developed by the Department of Water Resources pursuant to Section 13800 of the Water Code and adopted by the State Water Resources Control Board or local agencies in accordance with Section 13801 of the Water Code." (*Id*., subd. (e).)

The statute defines a " 'permanently inactive well,' " in pertinent part, as "a well that has not been used for a period of one year, unless the person owning land in fee simple or in possession thereof under lease or contract of sale demonstrates an intent for future use. . . . A well owner shall provide evidence to the local health officer of an intent for future use of an inactive

well by maintaining the well in a way" that meets four enumerated maintenance requirements. (§ 115700, subd. (d).)

The Wilsons argue these provisions, and particularly subdivision (d), mean "the owner of land on which a well that is not in use has one full year to demonstrate intent for future use before such well is rendered 'abandoned.' If the [statutorily required] maintenance requirements are not met within that one-year period of non-use, the well becomes abandoned" and must be destroyed. Thus, according to the Wilsons, this showing had to have been made within one year of the construction of the 1981 well or, at the very latest, by December 31, 1991, the date set forth in the county well ordinance.

The statute simply does not say what the Wilsons claim it does.

It is clear from the first clause of subdivision (d) that the necessary predicate for a "permanently inactive" well" is one year of non-use. The second clause makes clear that if a well is unused for a year it will fall into the category of a " 'permanently inactive' " well, "***unless***" the owner of the inactive well provides evidence to the local health officer of "intent for future use" of the well and properly maintains it. (§ 115700, subd. (d), italics & boldface added.) Thus, the statute plainly distinguishes between "inactive" wells and "permanently inactive" wells, and provides that upon a proper evidentiary showing by the owner, an "inactive" well will remain such and not become a "permanently inactive" well subject to destruction.

There is no language in the statute setting forth a timeline or deadline for a well owner to make this evidentiary showing to the local health officer. Had the Legislature intended that such evidentiary showing must be made within the predicate one year of nonuse, it could have included such language in the statute. But it did not do so, and it is not our role to add such a requirement through judicial fiat. (See *Hayes v. Temecula Valley Unified*

17

*School Dist.* (2018) 21 Cal.App.5th 735, 748 ["[O]ur task is ' "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted. . . ." [Citation.] We cannot add . . . language . . . when the Legislature did not.' "].)

This is also the only common sense reading of section 115700. There is absolutely no indication from the statutory language the Legislature intended that every unused well discovered, for example, by a new owner, must be immediately earmarked "permanently inactive" and destroyed, without any opportunity for the new owner to demonstrate "intent for future use" and regardless of whether the well can be readily brought into compliance with the statute and thereby achieve the Legislature's environmental and public safety objectives in enacting it. We, of course, are cautioned not to interpret statutory language in a way that leads to an absurd result. (See *Ellena, supra,* 230 Cal.App.4th at p. 209 [' " ' "[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." ' " ' " '].)

The same points pertain to the county's well ordinance, which largely adopts the DWR Well Standards, including the DWR Well Standards definition of "Abandoned Well" (used interchangeably with "permanently inactive" well), which utilizes essentially the same terminology as subdivision (d) of section 115700. (Bulletin 74-90, p. 28.)

We further observe that respondents sought judicial notice by the trial court, which was granted, of well ordinances, rules, and policies promulgated by several other counties. Like Humboldt's well ordinance, not one of these provisions state, or indicate agreement with, the Wilsons' view that a well owner must, within the predicate one-year of non-use, demonstrate intent of

18

future use of an inactive well and proper maintenance thereof, on pain of their well being forever deemed a "permanently inactive" well that must be destroyed. Given the vigilance with which state agencies, including DWR, monitor local well regulation, there certainly would have been administrative or legislative action if local entities were improperly implementing statutory and regulatory well standards. (Cf. *Almond Alliance of California v. Fish & Game Com.* (2022) 79 Cal.App.5th 337, 355 [had Legislature disagreed with Department's and Commission's longstanding use of a definition in one part of statutory scheme in applying a different part, "Legislature could have said so or provided a different definition" but "did neither;" "Legislative acquiescence in the face of a responsible agency's known construction of a statutory term indicates the Legislature did not intend to disturb the agency's interpretation"].)

The Wilsons have not challenged DEH's determination that Geck-Moeller adequately demonstrated an "intent for future use of" the inactive well and that the well is being maintained consistent with the statutory requirements. Rather, their claim for writ relief rests entirely on their assertion that the requisite showing by Geck-Moeller was made too late in the day. For the reasons we have stated, we do not agree, and for this reason, alone, their writ petition was properly denied.

Moreover, even if the Wilsons' reading of section 115700, subdivision (d) were correct—that after the predicate one year of nonuse, an evidentiary showing of "intent for future use of" the well and proper maintenance can never be made—this does not mean, contrary to what the Wilsons claim, that respondents would have a *ministerial* duty to force Geck-Moeller to destroy his well.

19

The Wilsons' assertion that respondents have a mandatory ministerial duty to require the owner of a "permanently inactive" well to destroy it, is based on subdivision (e) of section 115700 and section 631-17 of the Humboldt County Code.

Subdivision (e) of section 115700 states in pertinent part, "At a minimum, permanently inactive wells shall be destroyed in accordance with standards developed by the Department of Water Resources pursuant to Section 13800 of the Water Code and adopted by the State Water Resources Control Board or local agencies in accordance with Section 13801 of the Water Code." Thus, section 115700, subdivision (e), directs our attention to the DWR Well Water Standards Bulletins.

As we have recited, Part III of Bulletin 74-81, sets forth standards pertaining to the "Destruction of Wells," supplemented by Part III of Bulletin 74-90. (Bulletin 74-81; Bulletin 74-90, p. 28.) Section 20, titled "Purpose of Destruction," states in pertinent part, "A well that is no longer useful . . . must be destroyed in order to: [¶] 1. Assure that the ground water supply is protected and preserved for further use. [¶] 2. Eliminate the potential physical hazard." (Bulletin 74-81.) Section 22, titled "General Requirement," states in pertinent part, "All 'abandoned' wells . . . shall be destroyed. The objective of destruction is to restore as nearly as possible those subsurface conditions which existed before the well was constructed taking into account also changes, if any, which have occurred since the time of construction. . . . [¶] Destruction of a well shall consist of the complete filling of the well in accordance with the procedures described in Section 23 (following)." (*Ibid.*)

However, the DWR Bulletins also expressly provide for exemptions. Section 3, titled "Exemption Due to Unusual Conditions," of Chapter II of Bulletin 74-81, titled "Standards," (some capitalization omitted) states, "If

20

the enforcing agency finds that compliance with *any* of the requirements prescribed herein is impractical for a particular location because of unusual conditions or if compliance would result in construction of an unsatisfactory well, the enforcing agency may waive compliance and prescribe alternative requirements which are 'equal to' these standards in terms of protection obtained."[7]  (Bulletin 74-81, italics added.)

Thus, while the language of sections 20 and 22 of Part III of Bulletin 74-81 may use ostensibly mandatory language—i.e., "[a] well that is no longer useful . . . must be destroyed" and "[a]ll 'abandoned' wells . . . shall be destroyed"—section 3 of Chapter II expressly reserves to the enforcing agency the *discretion* to "waive compliance" and "prescribe alternative requirements which are 'equal to' these standards in terms of protection obtained." (Bulletin 74-81.)

Section 631-17 of the county well ordinance, in turn, states, "All persons owning an abandoned w[e]ll as defined in" the DWR Well Standards Bulletins "shall destroy it before December 31, 1991, except those excluded under Health and Safety Code [section] 24440."

But as the DWR standards permit, the well ordinance provides that DEH may "grant a variance from any provision of the standards" and "prescribe alternative requirements in their place" if there is "a special circumstance where practical difficulties or unnecessary hardship would result from the strict interpretation and enforcement of any standard" and the "granting of such a variance is consistent with the purpose of the division." (Humboldt County Code, § 631-11, subds. (a), (b).)

---

[7]  As we have noted, section 3, is expressly incorporated by reference in "Standards [¶]  Part I. General" of Bulletin 74-90.  (Bulletin 74-90, p. 11, some capitalization omitted.)

Thus, as do the DWR standards, the county's well ordinance expressly reserves to the enforcing agency the *discretion* to excuse strict compliance with any standard so long as it is consistent with the objectives of the standards to protect water quality and public safety.

The Wilsons do not dispute that determining whether to grant an exception or variance is a discretionary action, and not a ministerial one. Indeed, granting an exception or variance is the sin qua non of a discretionary action. (See generally 8 Witkin, Summary of Cal. Law (11th ed. 2024) Constitutional Law, § 1180.)

Rather, they argue that in "*this particular*" case no such discretion was exercised by respondents, citing *Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479 (*POWER*). In that case, our Supreme Court considered whether the County of Stanislaus could classify all "nonvariance well construction permits" issued under its ordinance incorporating the DWR Well Standards as ministerial projects exempt from CEQA. (*Id.* at pp. 491, 487.) The high court concluded "blanket classification" of the permits as ministerial was improper, as some permitting decisions under the local ordinance were discretionary, and the court remanded the matter for further proceedings. (*Id.* at pp. 487, 501–502.)

The court employed the definitions of "ministerial" and "discretionary" set forth in the CEQA Guidelines. (*POWER, supra,* 10 Cal.5th at p. 489.) Under the Guidelines, "[a] project is discretionary when an agency is required to exercise judgment or deliberation in deciding whether to approve an activity. [Citation.] It is distinguished from a ministerial project, for which the agency merely determines whether applicable statutes, ordinances, regulations, or other fixed standards have been satisfied. [Citation.] Ministerial projects are those for which 'the law requires [an] agency to act

22

. . . in a set way without allowing the agency to use its own judgment. . . .' [Citation.] They involve 'little or no personal judgment by the public official as to the wisdom or manner of carrying out the project. . . .' " (*Id.* at p. 489.) The court further explained that "[c]ourts have developed a functional test to further refine this distinction. [Citation.] Like the CEQA Guidelines, the functional test focuses on the scope of an agency's discretion. The 'touchstone' is whether the relevant 'approval process . . . allows the government to shape the project in any way [by requiring modifications] which could respond to any of the concerns which might be identified' by environmental review. [Citations.] . . . 'The statutory distinction between discretionary and purely ministerial projects implicitly recognizes that unless a public agency [is authorized to] shape the project in a way that would respond to concerns raised in an [environmental impact report], or its functional equivalent, environmental review would be a meaningless exercise.' " (*Id.* at pp. 493–494.)

The court then examined the provisions of the county's well ordinance pertaining to the construction of wells. Some provisions, like whether distance requirements are "adequate," require the " 'evaluation' " of site conditions, which "confers significant discretion on the county health officer to deviate from the general standards." (*POWER, supra,* 10 Cal.5th at pp. 496–497.) Even if some aspects of the siting assessment are ministerial, under CEQA " 'an approval that contains elements of both a ministerial action and a discretionary action,' " " 'will be deemed to be discretionary.' " (*Id.* at p. 497.)

While rejecting the county's treatment of *all* "nonvariance well construction permits" as ministerial, the court also rejected the petitioner's argument that *all* such permits are discretionary and thus trigger

23

environmental review under CEQA. (*POWER, supra,* 10 Cal.5th at pp. 491, 499–500.) The court explained that if the discretionary provisions of a local ordinance are "not relevant to the permit at issue," the agency's action as to that permit can be deemed ministerial. (*Id.* at p. 500.) The court went on to observe that the county's ordinance "incorporates a number of standards that may never come into play in the issuance of a particular [well construction] permit" and that the discretionary siting provisions only apply "when there is a contamination source near the proposed well." (*Ibid.*) If there is no nearby contamination source, these discretionary provisions do not apply. (*Ibid.*) And if no other discretionary provisions apply, issuance of the construction permit will be ministerial. (*Id.* at pp. 500–501.)

*POWER* does not assist the Wilsons' case. As we have discussed, the foundation of their claim is that the well at issue *is* a "permanently inactive well" under subdivision (d) of section 115700. And given that asserted classification, they maintain the well must be destroyed under subdivision (e) of that section and section 631-17 of the county well ordinance. *This* is essentially an across-the-board claim that necessarily puts "into play" (*POWER, supra,* 10 Cal.5th at p. 500) the exception and variance provisions set forth in the DWR Bulletins and section 631-11 of the county well ordinance, which indisputably confer discretion on DEH.

The Wilsons point out Geck-Moeller did not ask for, and DEH did not approve, a variance as to the well destruction standards, as occurred with respect to the well water production requirements.[8] This was, of course, because DEH concluded that Geck-Moeller could, and did, adequately

---

[8] We note the request and approval of a variance as to water production was a relatively informal matter, with the request being approved in a letter.

demonstrate "an intent for future use" and that the well was being properly maintained—a conclusion we have ruled was proper.

But this does not mean that in considering the fundamental legal proposition the Wilsons are advancing—that the destruction of an "inactive well" is a *mandatory* ministerial act—the discretionary provisions of the DWR Well Standards and county's well ordinance are irrelevant. What the Wilsons are advocating is a *categorical* claim that any and all "permanently inactive" wells must, without exception, be destroyed. This position is akin to the "categorical" claim advanced in *POWER,* which our Supreme Court rejected in light of the potentially applicable discretionary provisions of the Stanislaus well ordinance. For the same reasons, we reject the Wilsons' categorical position here.

Finally, we observe that allowing an owner of a well that is "permanently inactive" under the Wilsons' posited definition to demonstrate that they now have an intent of future use and that the well is currently being maintained in accordance with statutory requirements, or can readily be brought into compliance therewith, fully satisfies the objectives of the DWR well destruction standards and the like provisions of the county well ordinance—protecting groundwater quality and public safety.

Accordingly, respondents do not have a categorical ministerial duty to require the destruction of any "permanently inactive" well, but rather retain discretion in this regard under subdivision (e) of section 115700, DWR Bulletins 74-81 and 74-90, and section 631-11 of the county's well ordinance.

***The Judgment and the Ruling on Attorney Fees***

The Wilsons also maintain the trial court (1) wrongfully signed the proposed judgment submitted by Geck-Moeller, the real party in interest, because he did not appear at the hearing and (2) improperly ruled on the

25

issue of attorney fees because, while fees were sought in the writ petition, no motion for fees was pending before the court.

As to the judgment, the Wilson's seem to be advancing two points: first, that Geck-Moeller did not make an official appearance on the record at the hearing (although he was present in the courtroom) and therefore was not a "party" who could submit a proposed judgment, and, second, he did not timely submit the proposed judgment under California Rules of Court, rule 3.1590, subdivision (l). Geck-Moeller is indisputably a party to this litigation. (See *Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 160 ["Although a 'party' in an action ordinarily is a plaintiff or defendant [citation], a real party in interest in a mandamus proceeding also is regarded as a party to the litigation."].) As to the timeliness of his submission of the proposed judgment, even assuming it was submitted outside the time frame set forth in the rule, the Wilsons cite no authority that even remotely suggests the judgment is invalid. Nor are we aware of any such authority.

As to attorney fees, the issue is moot since the Wilsons have not prevailed on appeal and therefore are not "successful" parties entitled to seek fees under Code of Civil Procedure section 1021.5, which states, in relevant part, "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest. . . ."

## DISPOSITION

The judgment is affirmed. Costs are awarded to the County. (Cal. Rules of Court, rule 8.278(a)(2).)

_____
Banke, J.

We concur:


_____
Humes, P. J.


_____
Langhorne Wilson, J.

A170333, Wilson et al v. Humboldt County

27